**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 8:07CR137** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **ALVARO ARCINIEGA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant Alvaro Arciniega's Motion to Suppress Evidence/Motion to Suppress Statements (Doc. 12). The motion was heard on June 14, 2007 (Doc. 20) and October 24, 2007 (Doc. 44). The final hearing transcript was filed on October 27, 2007 and the motion was deemed submitted.

The defendant requests the suppression of all evidence and statements obtained by law enforcement on February 27, 2007. Specifically, the defendant alleges that he was stopped and searched without warrant or probable cause in violation of the Fourth Amendment to the United States Constitution; gave statements in violation of his right against self-incrimination under the Fifth Amendment to the United States Constitution; and that Neb. Rev. Stat. § 60-6,256 is unconstitutional. The defendant also alleges that the search of his vehicle, business, and home were improper and in violation of the Fourth Amendment to the United States Constitution.

The government alleges the stop of the defendant's vehicle was based on probable cause, that the defendant was traveling to a drug deal, and an air freshener was hanging from the vehicle's rearview mirror in violation of § 60-6,256; that the search of the defendant's vehicle was based on probable cause because a drug dog alerted to the

vehicle; that the search of the defendant's business and house was based on the defendant's verbal and written consents; and that the defendant's statement followed *Miranda* warnings and the defendant's waiver of his rights.

## FACTUAL BACKGROUND

Michael Bossman testified at the June 14, 2007 hearing that he is a five-year veteran of the Omaha Police Department assigned with his dog Skeen to the canine unit. He and Skeen patrol Omaha and support the uniform patrol bureau by assisting in high-risk patrol and narcotics calls (Doc. 20, 5:6-23).

Bossman and Skeen have worked together since March of 2006. They search people, vehicles, and buildings for narcotics and completed a twelve-week training program ending in certification (Doc. 20, 7:6-14). Skeen is an aggressive indicator, meaning he locates the strongest source of the odor of drugs and bites, barks, or scratches at the source (Doc. 20, 9:24-10:2). Skeen is trained to detect four controlled substances–heroin, methamphetamine, marijuana, and cocaine (10:6-10).

Bossman testified that on February 27, 2007 he was told that the narcotics unit had requested canine assistance and that he should travel to the Southeast assembly building for a briefing (Doc. 20, 11:20-12:2). After arriving at the building, Bossman was informed of a target vehicle owned by the defendant, a green Dodge Durango (Doc. 20, 12:20-23) and was ordered to 123rd and Pacific Streets and to await further instructions (Doc. 20, 13:7-13).

Bossman testified that after traveling to 123rd and Pacific, he listened to radio surveillance between other officers describing a green Dodge Durango with a pink ribbon on the rear (Doc. 20, 14:18-15:3). He also heard radio traffic that the vehicle had one

-2-

occupant, Nebraska plate Number PCS863 (Doc. 20, 15:15-20), and was westbound on Pacific near 120th.  As the Durango passed his location, Bossman pulled behind it.  He noted a pink ribbon on the rear and the license plate number he had been given earlier (Doc. 20, 16:4-11).  As he followed, he observed that the Durango had a large oval air freshener hanging from the rearview mirror, which he believed was a violation of Nebraska law.  Based on the violation, he activated his emergency lights and the Durango to pulled over.  Bossman noted that his vehicle was not equipped with a camera (Doc. 20, 16:23-25).

 Bossman then exited his vehicle and approached the Durango.  He told the driver in English that he stopped him for illegal view obstruction and requested license, registration, and insurance (Doc. 20, 17:23-18:2).  The driver, who was identified as the defendant, Alvaro Arciniega, provided the paperwork.  Bossman asked him to step back to the cruiser to go over the paperwork.  As the defendant and Bossman walked to the cruiser, they were intercepted by narcotics officers who took custody of the defendant.

Bossman testified he then went to his cruiser, put Skeen on a leash, and he and Skeen approached the Durango (Doc. 20, 19:16-21).  Bossman gave Skeen the command to search for the odor of narcotics and as they walked to the passenger side of the vehicle, Skeen alerted (Doc. 20, 20:4-8).  Bossman described Skeen's alert as a strong head jerk towards the vehicle, ears perked up, tail wagging rapidly, and Skeen took a large sniff at the seam of the door (Doc. 20, 21:9-13).  As Bossman and Skeen continued around the vehicle, Skeen alerted on the driver's side front door, again jerking his head, moving his tail rapidly, perking up his ears, and taking a big sniff at the seam of the door (Doc. 20, 21:18-23).  Skeen then  began scratching on the driver's side between the front and rear

-3-

door.   Bossman opened the door and Skeen jumped inside the vehicle.   Once inside, Skeen jumped from the driver's to the passenger seat and stuck his head underneath the passenger seat (Doc. 20, 22:25-23:7).   Skeen began to bite at the floor signifying to Bossman that Skeen had located the strongest source of odor (Doc. 20, 23:9-13). Bossman then told the narcotic officers, who had arrived on the scene, that he had a positive canine indication (Doc. 20, 23:17-21). The officers then searched the Durango.

On cross-examination Bossman testified that prior to stopping the defendant he had used Skeen to search three other vehicles and that Skeen had never falsely indicated to the presence of narcotics or controlled substances (Doc. 20, 27:4-12).   Bossman admitted he had observed the air freshener and that it had not been mentioned by other officers (Doc. 20, 27:18-22).   Bossman noted that when he saw the Durango it was dusk and that he first noticed the air freshener as he followed the Durango within one car length (Doc. 20, 28:24-29:5).

On cross-examination Bossman testified he has conducted several hundred traffic stops for people with various things hanging from their rearview mirrors (Doc. 20, 32:7-16), and that many times he has seen people with air fresheners hanging from their rearview mirrors and just let them go by (Doc. 20, 33:6-9).   The government and the defendant entered into a stipulation that Officer Bossman would testify that he never *Mirandized* the defendant (Doc. 20, 36:11-19).

Gary Kula testified at the June 14, 2007 hearing that he is an 11-year employee of the Omaha Police Department.   On February 27, 2007 while working as a narcotics officer, he participated in a briefing regarding the Omaha Police Department's investigation of the defendant (Doc. 20, 38:6-9).   He was told the defendant was the target of a drug

-4-

investigation and that his job that evening would be to watch 1920 "W" Street, which law enforcement believed was the defendant's home (Doc. 20, 38:20-25). Kula was informed that the defendant would be involved with a green Dodge Durango sports utility vehicle and was given the vehicle's plate number (Doc. 20, 39:15-22). After positioning himself at 1920 "W" Street, Kula observed a green Dodge Durango driven by a Hispanic female leave the address and he was later informed that officers had tracked the vehicle to 25th and "Q" Streets, observed the female go into a business, and shortly thereafter a male, believed to be the defendant, leave the business, enter the Durango and drive away (Doc. 20, 40:14-21). Through radio communications Kula was informed that the Durango was tracked to the northbound JFK on-ramp and Kula was told that he should leave 1920 "W" Street and assist in a rolling surveillance of the Durango. At about 5:50 P.M. Kula made visual contact with the Durango, westbound on Interstate 80 and continued surveillance until the Durango was stopped by Bossman (Doc. 20, 44:3-8).

Kula testified that after the stop he approached the defendant, advised him that he was a police officer, and informed him he was conducting a narcotics investigation (Doc. 20, 44:20-23). Kula asked the defendant in English for permission to search the Durango. The defendant responded "yes" (Doc. 20, 46:15-24). Kula retrieved a permission to search form in the Spanish language (Ex. 1), filled in the blanks on the form, and explained the form to the defendant. Specifically, Kula advised the defendant of the contents of the form, that officers would like to search the Durango, and that the defendant had the right to deny permission to search. Kula asked the defendant if he spoke Spanish and the defendant responded he did. Kula did not ask if the defendant could read Spanish (Doc. 20, 49:2-16). Kula asked the defendant to read the form and if he understood and agreed, to

-5-

sign it.  Kula watched as the defendant appeared to read the form line by line and sign it. Kula admitted he did not hear anyone *Mirandize* the defendant (Doc. 20, 51:4-8).  The Durango was then searched in the presence of the defendant, who at no time requested that the search stop (Doc. 20, 53:8-15).  After the search was concluded, Kula told the defendant in English that drugs had been found and asked if he wanted to cooperate.  The defendant did not respond, but hung his head down and did not look up (Doc. 20, 51:14-20).  At that time Officer Lang arrived and Kula was sent to the business at 25th and "Q."

Kula testified that after arriving at 25th and "Q," he walked in to the business and observed an adult female and a young male 10-12 years old.  It was determined the female was Laura Ramirez, the defendant's wife and the titled owner of the Durango (Doc. 20, 54:6-12).  It became clear to Kula that there was a language barrier with Ramirez so the young male, Jesse, who was determined to be the son of Ramirez and the defendant, and who spoke fluent English, was asked to help by telling his mother what was going on. Through Jesse, Ramirez was advised that the defendant had been arrested, that police knew he had left the business just prior to his arrest, and the police wanted to search the business (Doc. 20, 55:2-7).  Eventually a female officer, Edith Andersen, who is fluent is Spanish, arrived and after conversations with the defendant, Kula was informed that permission to search the business had been granted and he and others searched the business (Doc. 20, 55:13-18). Kula testified that after the business was searched, he followed Ramirez and Jesse to the residence at 1920 "W" Street, and he and others searched the residence  (Doc. 20, 55:25-56:9).

On cross-examination Kula testified that when he asked the defendant at the traffic stop for permission to search the Durango, he did not advise him that if he said no officers would have to get a warrant (Doc. 20, 59:3-7).  Kula admitted that during the rolling surveillance of the Durango, he did not notice anything hanging from the rearview mirror (Doc. 20, 60:13-17) and that if he had seen something, he would not have told Bossman about it because he believed it insignificant (Doc. 20, 68:6-14).

On cross-examination Kula testified that after he arrived at the business, he was informed by Officer Lang that the defendant had consented to the search of the business, but because of the language barrier with Ramirez, the search did not occur until after Officer Andersen arrived to interpret (Doc. 20, 66:13-19).

Mark Lang testified that he is a 21-year veteran of the Omaha Police Department assigned to the narcotics unit.  Lang describes his duties as the investigation of individuals who are involved in the use, manufacturing, and distribution of illegal narcotics.  In February of 2007, after defendant's information from a cooperating witness that the defendant was involved in the distribution of powdered cocaine, he began an investigation (Doc. 20, 75:9-23).  On February 26, 2007 during a meeting with the cooperating witness, it was decided that the cooperating witness would contact the defendant and set up a cocaine buy for February 27th (Doc. 20, 77:9-15).  Based on telephone calls from the cooperating witness made in Lang's presence to the defendant, an agreement was made for the defendant to deliver a quarter kilo of powdered cocaine to the cooperating witness around 6:00 P.M. on the 27th (Doc. 20, 78:25-79:6), for an agreed-upon price of $5,000 (Doc. 20, 79:13-14).

-7-

Lang testified that on February 27th he met with the cooperating witness and narcotics officers and surveillance was placed on the defendant's home at 1920 "W" and his business at 25th and "Q". After everyone was in place, the cooperating witness, again in Lang's presence, called the defendant and the defendant told the cooperating witness that he would leave his location and meet the cooperating witness at a pre-designated location in approximately thirty minutes (Doc. 20, 80:10-14). Lang described the meeting location as between 120th and 180th on Pacific (Doc. 20, 80:15-20). The telephone call setting up the transaction occurred at 5:14 P.M. and law enforcement officers were in position at the defendant's home and business to determine which location the defendant would leave from.

On cross-examination, Lang testified that he was not present when Bossman stopped the Durango. He arrived after the Durango was stopped, and basically waited as Bossman deployed his dog and the permit to search was signed (Doc. 20, 85:10-18). While Lang did assist in the search of the Durango, it was Officer Laney who indicated he had located what appeared to be powdered cocaine under the front passenger seat (Doc. 20, 86:1-16). After the drugs were located, it was Lang who approached the defendant and told him that based on the location of what was believed to be powdered cocaine, he would like to proceed to the defendant's business at 25th and "Q". Lang asked the defendant if he would allow officers to search the business. The defendant responded "go ahead, okay" (Doc. 20, 90:6-17). Because Lang wanted to make sure the defendant understood, he asked the defendant if anybody would be at the business and he told the defendant that he wanted law enforcement's presence at the business to be "low key."

The defendant responded, "go ahead and do what you gotta do" (Doc. 20, 91:8-18).  The defendant was then placed in a police cruiser and transported to 25th and "Q" Street.

Lang testified that once at the business he, along with the defendant and Officers Kula and Bianchi, entered the business at approximately 6:52 P.M.  (Doc. 20, 92:6-16).  Inside they observed no customers, but did meet an adult female and a young man, both Hispanic.  The woman was determined to be Ramirez-Garcia, the defendant's wife, and the young man Jessie Arciniega, the son of the defendant and Ramirez-Garcia.  After officers produced their badges and identified themselves, Jesse volunteered that he spoke English and he was utilized during the initial contact with Ramirez-Garcia (Doc. 20, 93:2-12).

Lang testified that a permission to search form for both the business and for 1920 "W" Street was presented to the defendant.  The permission to search form was in English, but was communicated to the defendant in Spanish by Police Officer Edith Andersen, who had arrived at the scene to assist with translation (Doc. 20, 93:23-94:2).  After the defendant signed the form, the business was searched (Doc. 20, 94:7-8).  Lang noted that prior to the defendant's interview at the business, the defendant was *Mirandized* in Spanish by Officer Andersen (Doc. 20, 96:24-97:4).  Following the search of the business, Lang went to the defendant's home at 1920 "W" Street.

Officer Mark Lang continued his testimony on October 24, 2007 and on cross-examination testified that by "cooperating witness" he means a person willing to obtain information or corroborate information for law enforcement, and also willing to be a participant in or be exposed to an investigation (Doc. 44, 4:5-14).  Lang admitted that while at the traffic stop, all his conversations with the defendant were in English (Doc. 44,

9:2-4), and that no one at the stop could speak Spanish (Doc. 44, 9:14-17). Lang also admitted that all of the telephone conversations between the cooperating witness and the defendant were conducted in Spanish (Doc. 44, 22:18-22).

On cross-examination Lang verified that at the traffic stop, the defendant was not read his *Miranda* rights (Doc. 44, 23:24-24:1), but that they were read to him after he had given permission to search his business and home (Doc. 44, 24:17-21).

On redirect examination, Lang testified that Exhibit 2 is a photocopy of an Omaha Police Department permission to search form for 2424 "Q" Street and 1920 "W" Street and that he was present when Officer Edith Andersen translated the form into Spanish for the defendant (Doc. 44, 27:1-28:7).

Lang testified on redirect examination that prior to February 27th, he verified the cooperating witness' information by checking out the nickname the witness had given for the defendant, the addresses and vehicles the witness had identified as the defendant's, and with the telephone conversation the confidential witness had with the defendant while setting up the February 27th delivery of cocaine (Doc. 44, 28:19-29:9).

Edith M. Andersen testified that she is a seven-year employee of the Omaha Police Department currently assigned to the narcotics unit. On February 27, 2007 she was assigned to the north gang unit and served on occasion as a Spanish interpreter. Anderson was raised in a partial-Spanish speaking family, she took Spanish from eighth grade through college, and became a certified  Spanish speaking officer of the Omaha Police Department in January of 2002 (Doc. 44, 32:17-19). Andersen noted her duties as a certified Spanish-speaking officer include going over permission to search forms with Spanish speakers. On February 27, 2007 Andersen was deployed to 25th and "Q" to the

defendant's business which she described as a video and music store.  Upon arriving she was met by Officer Lang and given a short update.  She then entered the business and was asked by Officer Lang to go over a permission to search form with the defendant (Doc. 44, 38:4-12).  Andersen identified Exhibit 2 as an Omaha Police Department permission to search form that Officer Lang had completed, and she had used to interpret to the defendant in Spanish (Doc. 44, 38:16-23).  Andersen said she explained the form to the defendant pointing out the addresses the police would like to search, and she informed him that if he would allow the search of those locations, he would need to sign at the bottom of the form.  Andersen went over the form with the defendant in the presence of Officer Lang in the restroom of the business (Doc. 44, 40:10-13).  She observed the defendant's demeanor to be calm and cooperative, that he did not appear nervous, he was not shaking or crying, and he did not smell of alcohol (Doc. 44, 40:14-23).  Andersen noted after the defendant signed Exhibit 2 and the police officers began searching the business, Officer Lang asked her to go back to the restroom and advise the defendant of his rights (Doc. 44, 41:5-16).  Andersen returned to the restroom and using a rights advisory form in the English language, translated it verbally for the defendant into Spanish.  Andersen identified Exhibit 3 as the *Miranda* rights advisory card in English that Officer Lang had given her and which she used to translate to Spanish (Doc. 44, 42:3-8).

The parties stipulated that the defendant does not challenge the English to Spanish translation of either the *Miranda* rights (Ex. 3), or the permission to search form for the residence and business (Ex. 2) (Doc. 44, 44:3-21).

Officer Andersen testified that after the defendant received his *Miranda* advisements, he agreed to provide a statement (Doc. 44, 44:24-45:4) and Andersen

assisted with interpretation of the interview (Doc. 44, 45:5-18), which she estimated lasted ten minutes (Doc. 44, 57:1-2).

On cross-examination Andersen admitted she was not present at the traffic stop. She also stated that she believes the Omaha Police Department has a permission to search form in the Spanish language (Doc. 44, 46:9-12).  However, she did not believe that on the date in question Officer Lang had a Spanish permission to search form in his possession (Doc. 44, 46:13-16).  Andersen testified that during her time with the defendant she had heard him speak English and would categorize his English as broken, not fluent, but due to his responses he seemed to understand what was being said (Doc. 44, 49:10-12).  She noted he was able to carry on a conversation in English, though his sentences were not complete and he spoke in phrases, not sentences (Doc. 44, 49:16-22).

On cross-examination Andersen testified that all her contact with the defendant occurred in the bathroom of the business because the defendant's wife and child were at the scene and police wanted to separate him so that they could have a private conversation (Doc. 44, 51:25-52:6).  Andersen verified that the defendant was *Mirandized* after he had already given verbal and written consent to search his business and home (Doc. 44, 54:5-17).

## LEGAL ANALYSIS

### A.  Probable Cause To Stop – Traffic Violation

In *United States v. Mallari*, 334 F.3d 765, 766-67 (8th Cir. 2003), the Eighth Circuit stated:

> We have repeatedly held that "any traffic violation, – regardless of its
> perceived severity, provides an officer with probable cause to stop the

driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." An officer is justified in stopping a motorist when the officer "objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996); *see Sanders*, 196 F.3d at 913 (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Moreover, subjective intent is not determinative in deciding whether the stop as reasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

*See also, e.g., United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007); *United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006); *United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1022 (8th Cir. 2006).

The evidence in this case establishes that on February 27, 2007, Omaha police department Officer Michael Bossman, while following the defendant's Durango, observed an air freshener hanging from the vehicle's rearview mirror.

Neb. Rev. Stat. § 60-6,256 provides:

It shall be unlawful for any person to operate a motor vehicle with any object placed or hung in or upon such vehicle, except required or permitted equipment of the vehicle, in such a manner as to obstruct or interfere with the view of the operator through the windshield or to prevent the operator from having a clear and full view of the road and condition of traffic behind such vehicle. Any sticker or identification authorized or required by the federal government or any agency thereof or the State of Nebraska or any political subdivision thereof may be placed upon the windshield without violating the provisions of this section. Any person violating the provisions of this section shall be guilty of a Class V misdemeanor.

While the defendant argues that the stop of the Durango based on a minor traffic violation was a pretext for a drug investigation, such a finding would not result in suppression because an officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. *United States v. Mallari*, 334 F.3d at 766-67;

-13-

*United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003). "This is true even if a valid traffic stop is a pretext for other investigation." *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002); *see Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis"). As long as an officer "objectively has a reasonable basis for believing that the driver has breached a traffic law," the officer has probable cause to conduct a traffic stop. *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996); *United States v. Rodriguez-Lopez*, 444 F.3d at 1022.

While there is no videotape of the stop (because the officer's cruiser was not equipped with a camera) I find Bossman's testimony to be credible and he objectively had a reasonable basis for believing the defendant breached a traffic law. Consequently, I find that the perceived traffic violation provided probable cause for stopping the Durango.

## B. Probable Cause – Felony Drug Offense

The defendant, Alvaro Arciniega, complains that the officers who detained him did not have probable cause to do so. However, "police officers may make warrantless arrests when they have probable cause to believe a person has committed a felony." *United States v. Travis*, 993 F.2d 1316, 1323 (8th Cir.), *cert. denied,* 510 U.S. 883 & 889 (1993) (citing *United States v. Watson,* 423 U.S. 411 (1976)). "Probable cause exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "In making this determination, the court may consider the collective knowledge of all officers involved." *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993).

-14-

Considering the collective knowledge of the officers involved, including the knowledge of Officer Lang that a drug delivery was being committed, the court finds that the officers had probable cause to stop and arrest Alvaro Arciniega on suspicion of felony drug violations. Specifically, officers were aware that a cooperating witness had arranged to purchase cocaine from the defendant, and after a telephone conversation with the cooperating witness the defendant left his business and traveled in the direction of the prearranged delivery point.

### C. Deployment of the Canine

Following the traffic stop of the defendant's Durango, Officer Bossman, within a very short time, deployed his canine Skeen. The act of a trained canine sniffing the air surrounding a vehicle has been deemed not to be a search by the Supreme Court, and thus does not require probable cause. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("[T]he dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."). *Accord United States v. Olivera- Mendez*, 484 F.3d 505, 512 (8th Cir. 2007).

Furthermore, the Eighth Circuit Court of Appeals held in *United States v. $404,905 in U.S. Currency*, 182 F.3d 643, 649 (8th Cir. 1999) that, "[W]hen a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure [a dog sniff], it does not violate the Fourth Amendment to require that the offending motorist's detention be momentarily extended for a canine sniff of the vehicle's exterior." *See also United States v. Alexander*, 448 F.3d

-15-

1014, 1016 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 929 (2007); *United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005)

The actual sniffing and alert by Skeen was almost immediate, and was permissible even if it occurred without probable cause.

### D.  Probable Cause to Search

The police officers had probable cause to search defendant's Durango once Skeen alerted to the presence of drugs.  "A dog's identification of drugs in luggage or in a car provides probable cause that drugs are present." *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (en banc), *cert. denied,* 514 U.S. 1113 (1995) (citing *United States v. Place,* 462 U.S. 696, 706 (1983)).  In this case, Skeen's drug detecting abilities, while challenged, appear from the record to be perfect.  Skeen, in fact, had never falsely alerted to the presence of drugs.  *Compare United States v. Heir*, 107 F. Supp. 2d 1088, 1095 (D. Neb. 2000) (dog's actions did not positively signal the presence of drugs inside defendant's vehicle and Magistrate Judge Piester opined in dicta that drug detection dog's qualifications were "questionable").

The officers were not required to obtain a search warrant before searching the Durango.  "Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement." *Bloomfield*, 40 F.3d at 919. "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment ... permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).  Additionally, once the suspected drugs were located, probable cause existed to arrest the defendant.

### E.  Consent to Search

Alvaro Arciniega also contends that the warrantless search of his business and residence violated his right to be secure from unreasonable searches and seizures.

The Fourth Amendment protects people from unreasonable searches of their "persons, houses, papers and effects."  U.S. Const. amend. IV. A warrantless search of a house is presumptively unreasonable.  *Payton v. New York,* 445 U.S. 573, 586 (1980), and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment.  *Steagald v. United States*, 451 U.S. 204, 211-212 (1981).  Police may conduct a search of someone's business or home, even without a warrant or probable cause, if that person voluntarily consents to the search.  *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir.1990); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *see also United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996).

To determine whether a consent is voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter.  *See Bradley*, 234 F.3d at 366.  The government has the burden of proving the consent was voluntary.  *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995).  "The prosecution need not prove that the individual is fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).

I credit Officer Lang's and Officer Andersen's testimony that Alvaro Arciniega was given a Spanish-language permission to search form (Ex. 2), and that he read or appeared to read it before signing the form.  Based on the officers' testimony, which I find to be

credible, I find that the defendant knew he was being asked for permission to search his business and residence and he knew he could refuse to give permission to search. Knowing these rights, Alvaro Arciniega signed the form and gave the officers permission to search his business and residence.

Turning to the issue of voluntariness and the *Chaidez* factors,[1] there is no evidence, save that the permission was given in the bathroom, that the defendant's will was overborne, or that he was coerced, deceived, or promised anything in return for signing the consent form.  *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.).

Considering the testimony in this case and the *Chaidez* factors, I find that Alvaro Arciniega voluntarily consented, both verbally and in writing, to the search of his business and residence.

---

[1]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id.* at 381 (internal citations omitted).  Characteristics of "the environment in which consent was given" include:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id.* (internal citations omitted). The factors should not be applied mechanically, *id.*, and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

-18-

### F. *Miranda* Warnings

Alvaro Arciniega was clearly in police custody when his interview with Officer Lang took place in the bathroom of his business.  The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), are triggered when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992).  Contrary to his assertions, the record shows that Alvaro Arciniega was, in fact, advised of his *Miranda* rights in Spanish before the interview.  The testimony of Officer Andersen is in substantial conflict with the position of the defendant.  I credit Officer Andersen's testimony that she read Alvaro Arciniega his *Miranda* rights in Spanish using an English language *Miranda* warning card (Ex. 3), that Alvaro Arciniega responded to the questions and he never told anyone that he did not understand.  I find the officers' testimony credible.  I find Alvaro Arciniega was given his *Miranda* rights, understood his rights, and agreed to talk to Officer Lang without an attorney present.

### G.  Constitutionality of Neb. Rev. Stat. § 60-6,256

In his brief, the defendant presented the argument that Neb. Rev. Stat. § 60-6,256 is unconstitutional

> on its face and does not meet the Rational Basis standard. The statute itself exempts "Any sticker or identification authorized or required by the federal government or any agency thereof or the State of Nebraska or any political subdivision thereof...." The State exempts windshield obstructions issued by the government without providing any rational reason why a government issued windshield obstruction is inherently safer than any other type of object affixed to the windshield of an automobile or hung from inside. In essence, the State's intention that all drivers have a clear and unobstructed view of the road for safety purposes fails when it allows its own obstructive devices to be used without penalty, and thus the implementation of the statute becomes a pretext for searches violative of the Fourth Amendment.

-19-

> 4. Neb. Rev. Stat. § 60-6,256 in its application is violative of the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution. The Statute is enforced arbitrarily and capriciously, and serves the States only as a pretext for conducting warrantless searches of vehicles in the absence of a warrant issued for probable cause.

Doc. 13 at pp. 3-4.  During oral argument, counsel elaborated:

> I think it's a bogus statute.  I think it's an unconstitutional statute. We have a handicap placard already in evidence that is bigger than the air freshener. The only difference is that the Government issues that placard and not air fresheners.  And the statute making an exception for something to be hung from the rear view mirror which is larger than the air freshener means, to me, that this statute is intended to be a pretext for initiating traffic stops.

Doc. 44, 64:24-65:7.

The record does not support these assertions, and the court can find no actual legal authority that tends to support the defendant's position.  For these reasons, I find that the argument has been waived.

In any event, the Eighth Circuit has recently reviewed the provisions of § 60-6,256 and rejected a challenge to the statute based on ambiguity:

> Nebraska motor vehicle law provides that it is "unlawful for any person to operate a motor vehicle with any object placed or hung in or upon such vehicle, except required or permitted equipment of the vehicle, in such a manner as to obstruct or interfere with the view of the operator through the windshield or to prevent the operator from having a clear and full view of the road and condition of traffic behind such vehicle."  Neb. Rev. Stat. § 60-6,256 (Reissue 1998).  Officer Hanson testified that he observed a violation of this provision when Ramos-Caraballo's car passed him on the interstate with an air-freshener hanging from the rearview mirror. Ramos-Caraballo asserts that the statute is ambiguous and should be construed to permit objects to hang from the mirror if they do not significantly obstruct or interfere with the driver's view through the windshield so as to create a safety hazard.  Under this reading of the statute, he argues that Officer Hanson did not have probable cause to stop his vehicle because the air freshener did not amount to a significant view obstruction.

We respectfully disagree with this reading of the statute. The plain language of the statute unambiguously provides that "any object" that obstructs a clear and full view through the windshield violates Nebraska law. Neb. Rev. Stat. § 60-6,256. The wording of the statute plainly indicates that the Nebraska legislature has already concluded as a matter of policy that any obstruction (not only a significant obstruction) of a clear and full view of the road is a safety hazard subject to regulation through this statute. *See id.* Officer Hanson testified at the suppression hearing that he observed "an item hanging from the rear view mirror" in violation of Nebraska's state traffic laws. (Suppression Hr'g Tr. at 14.) His observation provided probable cause for him to stop the vehicle, i.e., he had probable cause to believe he had observed a violation of Nebraska's traffic laws.

*United States v. Ramos-Caraballo*, 375 F.3d 797, 801 (8th Cir. 2004). *Accord United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004).

## RECOMMENDATION

For the reasons discussed above,

**IT IS RECOMMENDED** that the defendant's Motion to Suppress Evidence/Motion to Suppress Statements [12] be denied in its entirety.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing an "Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED: November 14, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-21-